IN THE SUPREME COURT OF 
TEXAS
════════════
No. 02-0244
════════════  
In The Interest 
of L.M.I. and J.A.I., Minor Children
════════════════════════════════════════════════════
On Petition for Review from 
the
Court of Appeals for the Fourteenth District of 
Texas
════════════════════════════════════════════════════
Argued on February 5, 2003
            Justice Owen, concurring and dissenting, 
joined by Chief Justice Phillips; 
Justice Hecht and Justice Jefferson joined in Part 
III.  
            I 
dissent from the judgment terminating Ricardo Duenas’s parental rights. Although 
I agree that Duenas did not raise a due process issue in the trial court, and 
therefore no due process complaint was preserved for appeal, Duenas’s underlying 
complaint is that there is no clear and convincing, legally sufficient evidence 
that the affidavit of relinquishment he signed was knowingly and thus 
voluntarily executed. An affidavit relinquishing parental rights is a waiver of 
a constitutionally protected, “fundamental liberty interest of natural parents 
in the care, custody, and management of their child.” 

 In that regard, it differs 
from affidavits commonly used in other civil proceedings, such as affidavits 
containing factual assertions in support of a motion or brief. As a waiver of a 
constitutionally protected interest, an affidavit of relinquishment must be a 
voluntary, knowing, and intelligent act. 

 The United States Supreme 
Court has held that the Due Process Clause of the Fourteenth Amendment requires 
that before a state can irrevocably sever the rights of a parent, the evidence 
of grounds for termination must at least be clear and convincing. 

 Accordingly, when the basis 
for termination is an affidavit of relinquishment, there must be clear and 
convincing evidence that the waiver was knowing, intelligent, and voluntary. In 
the case before us today, there is no clear and convincing, legally sufficient 
evidence that material parts of the affidavit Duenas signed were disclosed to 
him and thus that he in actuality swore to and agreed to be bound by the 
affidavit.
            The 
affidavit that Duenas signed was entirely in English. No one disputes that 
Duenas, a Honduran citizen, was unable to read English. The evidence is 
accordingly confined to what was said to Duenas in English and Spanish about the 
affidavit. There is no evidence, however, that Duenas’s command of the spoken 
English language was such that he understood what was said to him in that 
language. The Court concludes that the trial court could have surmised that 
Duenas understood more English than he and others said he could. But a surmise 
is no evidence at all, much less clear and convincing evidence. 

 The Court can point to 
nothing in the record other than speculation that Duenas was able to comprehend 
what was said to him in English when he was directed to sign the 
affidavit.
            We 
are thus left to examine what was said to Duenas in Spanish. The evidence is 
undisputed that the affidavit of relinquishment was never read to Duenas in 
Spanish. The grandmother of the children made a short statement to him in 
Spanish about the purpose of the affidavit. That statement did not apprise him 
of material provisions of the affidavit. 
            Duenas’s 
complaint that his affidavit was not knowing and voluntary is a valid one and 
was preserved. I would therefore reverse the termination of his parental rights. 
With regard to the mother of the children, Luz Maria Inocencio, I join in this 
Court’s judgment terminating her parental rights, but I do not agree with the 
reasoning of Justice O’Neill’s 
concurring opinion.
I
            Ricardo 
Duenas and Luz Maria Inocencio are the biological parents of twins. When the 
children were born, Duenas and Inocencio were not married. Inocencio was 
fifteen, and Duenas was twenty-five. The children and Inocencio lived with her 
mother when they came home from the hospital. There were familial difficulties, 
and at some point, Inocencio’s mother filed a proceeding with the trial court 
requesting that she be named managing conservator. While that proceeding was 
pending, Miles and Monica Montegut became involved with the family and hoped to 
adopt the twins. In the interest of brevity, I will not repeat the facts set 
forth in Justice Hecht’s 
dissenting opinion in any detail. I think it is important to emphasize, however, 
that the Monteguts, who were the prospective adoptive parents, were the moving 
force behind this controversy. Neither the State of Texas nor any state entity 
sought termination of the biological parents’ rights. The Monteguts retained an 
attorney to assist them with the adoption of the children. That attorney 
arranged for Duenas and Inocencio to come to his office to sign affidavits that 
purported to relinquish their respective parental rights. However, about a week 
later, Inocencio sought to revoke her affidavit and forestall any termination or 
adoption proceedings. Her mother was supportive of these efforts and had not 
dismissed the proceeding requesting that she be named managing 
conservator.
            In 
the face of opposition from Inocencio and her mother, the Monteguts nevertheless 
desired to proceed with adoption efforts and filed suit against Duenas and 
Inocencio, requesting the trial court to terminate the latters’ parental rights. 
Duenas then sought to revoke or otherwise set aside the affidavit that he had 
signed and filed a counterclaim seeking to establish his 
paternity.
            The 
trial court consolidated the Monteguts’ suit with the proceeding that had been 
filed by Inocencio’s mother. The affidavits of relinquishment that Duenas and 
Inocencio had signed stated that they were irrevocable, but only for sixty days. 
At the end of sixty days, the affidavits were fully revocable. The trial court 
denied Duenas and Inocencio’s motion for a continuance and proceeded with a bench trial 
in the consolidated proceedings just prior to the expiration of the sixty-day 
window during which the affidavits were irrevocable. (The affidavits were signed 
September 24, 1999, trial occurred on November 22 and 23, 1999, and an order of 
termination was entered December 16, 1999.)
            The 
trial court terminated Duenas’s and Inocencio’s parental rights based on the 
affidavits and appointed the Monteguts managing conservators of the children. 
Duenas and Inocencio appealed, and the court of appeals affirmed the trial 
court’s order of termination. This Court granted the joint petition for review 
filed by Duenas and Inocencio.
II
            In 
deciding this case, it must first be determined what arguments have been made 
and if they were preserved for appeal. The affidavit that Duenas filed in the 
trial court in an attempt to revoke the “Affidavit of Relinquishment of Parental 
Rights” that he had previously signed said, “[t]he Affidavit of Relinquishment 
was not translated for me. I was told I would go to jail if I did not sign the 
documents.” Unquestionably, much of the trial in this case was devoted to 
determining the extent to which Duenas was apprised of the contents of the 
affidavit and the extent to which he understood what he had signed. The trial 
court’s only basis for terminating Duenas’s parental rights was the 
relinquishment affidavit, which the trial court affirmatively found had been 
“signed voluntarily” and was not procured by fraud, duress, or 
coercion.
            In 
the court of appeals, Duenas contended for the first time that his due process 
rights had been violated. In setting forth how he believed those rights had been 
violated, he explained that it was because the affidavit that he signed was in 
English, which he could not read, and that it was not translated into Spanish 
for him either orally or in writing. His brief in the court of appeals contained 
a section titled “Scope of Review–Appellate Court Must Look at All Evidence.” In 
that section, the brief said: “This Honorable Appellate Court must sustain 
Appellants’ challenge to the sufficiency of the evidence if this Court finds 
that the trier of fact could not have reasonably found the termination of 
Appellants’ rights was not [sic] established by clear and convincing evidence.” 
In our recent decision in In re J.F.C., we held that “[i]n a legal 
sufficiency review, a court should look at all the evidence in the light most 
favorable to the finding to determine whether a reasonable trier of fact could 
have formed a firm belief or conviction that its finding was true.” 

 Thus, the basis Duenas 
articulated for his due process claim was that the evidence was legally 
insufficient to support a finding that he had properly executed a voluntary 
affidavit of relinquishment.
            Duenas’s 
briefing in this Court does not contain the identical statement regarding 
“sufficiency of the evidence” that was in his court of appeals’ brief. But a 
fair reading of his brief in this Court shows that his basic complaint 
underlying and supporting his due process issue is that the evidence was legally 
insufficient to support the trial court’s findings regarding the affidavit. The 
entire focus of the statement of facts in Duenas’s brief is that he does not 
understand English and that the substance of the affidavit was not translated 
for him, nor was its substance explained to him in Spanish. He repeats the 
arguments he made in the court of appeals that the trial court’s finding must be 
based on clear and convincing evidence and that his execution of the affidavit 
of relinquishment was not knowing and voluntary because its core terms were not 
translated for him. He asserts that the clear and convincing evidence burden of 
proof “is not lessened by proof of an irrevocable affidavit of relinquishment. 
In fact, such affidavit being one of the alleged grounds for termination, the 
affidavit must be established under that burden of proof.” He is thus 
complaining that there was no clear and convincing evidence to support a finding 
that his affidavit was knowingly and voluntarily executed. 
            Certainly, 
Duenas could have more clearly articulated that he was bringing a legal 
sufficiency challenge in this Court. But his failure to use “magic words” is not 
fatal. The United States Supreme Court has said in an analogous 
context:
A generic reference to the 
Fourteenth Amendment is not sufficient to preserve a constitutional claim based 
on an unidentified provision of the Bill of Rights, but in this case the 
authority cited by petitioner and the manner in which the fundamental right at 
issue has been described and understood by the Illinois courts make it 
appropriate to conclude that the constitutional question was sufficiently well 
presented to the state courts to support our jurisdiction. 

 

            Similarly, 
as Justice Hecht’s dissent points 
out, 

 this Court has long held 
that points of error (now “issues or points presented for review” 

 ) and arguments made in 
briefs will be liberally construed “to obtain a just, fair and equitable 
adjudication of the rights of the litigants.” 

 We should be particularly 
careful to avoid dismissing substantive arguments on overly technical procedural 
grounds when termination of parental rights is at issue.
            At 
least one Texas court of appeals has said in a parental termination case, “[w]e 
interpret [the biological mother’s] appellate attack on the 
voluntariness of her affidavit as a challenge to the legal sufficiency of the 
evidence to support the trial court’s presumed voluntariness finding.” 

 I would similarly hold that 
Duenas preserved a legal sufficiency challenge in this Court. 
            To 
support its holding that error was not preserved, this Court quotes counsel for 
Duenas and Inocencio when he said, in response to a question at oral argument, 
that his clients have not contended that the affidavit fails to comply with the 
Family Code. 

 But counsel’s response to the question at oral 
argument does not amount to a statement, much less an admission, that the legal 
sufficiency of the evidence supporting the voluntariness of the affidavits is 
not at issue.
            Accordingly, 
I would decide Duenas’s petition based on his complaint that there is no legally 
sufficient evidence that his execution of the relinquishment affidavit was 
knowing and thus voluntary.
III
            The 
trial court’s only basis for terminating Duenas’s rights was the relinquishment 
affidavit. A parent who signs such an affidavit is surrendering rights protected 
by the United States Constitution. 

 The United States Supreme 
Court has made clear that “[w]aivers of constitutional rights not only must be 
voluntary but must be knowing, intelligent acts done with sufficient awareness 
of the relevant circumstances and likely consequences.” 

 We have likewise recognized 
that a waiver of constitutional rights must be voluntary, knowing, and 
intelligent, with full awareness of the legal consequences. 

 
            To 
that end, the Legislature has enacted requirements to ensure that a parent’s 
voluntary relinquishment of his or her rights to a child is indeed voluntary and 
is done with full knowledge of the rights that are being relinquished and the 
legal consequences. A trial court may terminate a parent’s rights if the court 
finds by clear and convincing evidence that the parent executed “an unrevoked or 
irrevocable affidavit of relinquishment of parental rights as provided by this 
chapter.” 

 Among other things, the 
affidavit must contain “a statement that the parent has been informed of 
parental rights and duties” and a statement that the relinquishment is 
revocable, irrevocable, or irrevocable for a stated period of time. 

 
            When 
a trial court is presented with an affidavit that, on its face, meets the 
requirements of section 161.103, the affidavit itself is prima facie proof that 
it was knowingly and voluntarily executed. Absent any other evidence, the trial 
court could base termination on such an affidavit. If a parent challenges the 
affidavit, the burden to produce evidence shifts to the parent to come forward 
with evidence that the affidavit was not knowingly and thus voluntarily 
executed. But the constitutional 

 and statutory 

 requirement that parental 
rights cannot be terminated unless grounds for termination are established by 
clear and convincing evidence necessarily means that the ultimate burden of 
proof based on clear and convincing evidence remains with the party seeking to 
terminate the parental rights.
            There 
has been some confusion among our courts of appeals about the burden of proof 
when an affidavit of relinquishment is challenged. The court of appeals in 
Neal v. Texas Department of Human Services correctly recognized that 
“[b]ecause of the very nature of a voluntary relinquishment of parental 
rights, . . . it is implicit in the language of section 15.03 that 
such an affidavit be executed voluntarily.” 

 And the court in that case 
correctly observed that a reviewing court must apply the clear and convincing 
standard of proof as part of its review of the evidence to determine whether an 
affidavit was voluntary:
When the trier of fact is required 
to make a finding made [sic] by clear and convincing evidence, the court of 
appeals will sustain an insufficient evidence point of error only if the fact 
finder could not have reasonably found that the fact was established by clear 
and convincing evidence.
 
Having reviewed all of the 
evidence in the record under the clear and convincing standard of proof, we 
conclude that the record before us does not contain evidence of that effect and 
quality. From the evidence in the record, we further conclude that the trial 
court could not have reasonably found by a “firm belief or 
conviction” that 
Dianna voluntarily executed the affidavit for relinquishment of parental 
rights. 

 

            Similarly, 
the court in B.A.L. v. Edna Gladney Home reviewed the record evidence of 
voluntariness based on the clear and convincing evidence standard, recognizing 
that at all times, the ultimate burden remained on the proponent of the 
affidavit to prove by clear and convincing evidence that the affidavit was 
voluntarily executed without duress. 

 The court concluded: 

After reviewing the record of the 
hearing on the motion for new trial and viewing it in the light of the standards 
set forth above, we have no trouble in holding that there was clear and 
convincing evidence to support the judgment of the trial court and the findings 
of fact necessarily implied to support that judgment. Under this evidence it is 
obvious, and the trial court was clearly entitled to find, as it did, that 
appellant signed the relinquishment affidavit voluntarily, intelligently, and 
knowingly, she was aware that she could keep her baby if she so desired with the 
full support, financial and otherwise of her own family, and she made her own 
choice to place the baby for adoption without any undue influence, pressure or 
overreaching on the part of The Edna Gladney Home. 

 

            Other 
decisions of the courts of appeals, however, have shifted the burden of proof to 
a parent challenging the affidavit. Those courts have said that once it is 
proven that a parent signed the affidavit, the parent must prove by a 
preponderance of the evidence that the affidavit was executed as a result of 
coercion, duress, fraud, deception, undue influence, or overreaching. 

 The first of these 
decisions seems to have been Coleman v. Smallwood, 

 and the courts of appeals 
that have followed it have done so without any analysis of why. The decision in 
Coleman relied on Pattison v. Spratlan 

 and Terrell v. 
Chambers 

 for its conclusions. The 
holding in Pattison was simply that “[i]n the absence of a statement of 
facts showing duress, we must presume in support of the judgment that appellant 
failed to establish her defense of duress.” 

 Thus, with no analysis and 
no comment at all about the burden of proof in a termination case, the court of 
appeals in Pattison labeled “duress” a “defense” in a termination case. 

            The 
court in Terrell cited Pattison for the proposition that the 
burden of proof is on a parent challenging an affidavit based on fraud or 
misrepresentation. 

 The Terrell decision 
also cited one of this Court’s decisions, Catholic Charities v. 
Harper, 

 for the proposition that an 
“irrevocable affidavit of relinquishment can be revoked only upon a showing of 
fraud, misrepresentation, over-reaching, or the like.” 

 Our decision in Catholic 
Charities was issued twenty years before our decision in In re G.M., 
in which we held that a court may not terminate parental rights unless it finds 
there are grounds for doing so by clear and convincing evidence, 

 and more than twenty years 
before the United States Supreme Court said the same in Santosky v. 
Kramer. 

 
            None 
of the courts of appeals that have shifted the burden of proof to a parent in a 
termination case have analyzed how that burden shifting comports with the clear 
and convincing evidence standard the United States Supreme Court has said is 
mandated by the United States Constitution. And some of those same courts of 
appeals have exhibited a misunderstanding of the standard of review on appeal 
when the burden of proof in the trial court was clear and convincing 
evidence. 

 They instead used the 
standard of review that applies when the burden of proof is only a preponderance 
of the evidence and when the appealing party has the burden of proof in the 
trial court. 

 Just recently, this Court 
explained the impact that the clear and convincing evidence requirement has on 
appellate review. 

 
            The 
clear and convincing evidence requirement necessarily means that the burden of 
proof that an affidavit of relinquishment was voluntarily executed cannot 
be shifted to a parent. There must be clear and convincing evidence, from the 
record as a whole, that the affidavit was knowingly and voluntarily 
executed. 

 Shifting the burden of 
proof to a parent is in irreconcilable conflict with the clear and convincing 
standard of proof that the United States Supreme Court has said the federal 
Constitution requires before parental rights can be terminated 

 and that the Texas 
Legislature has required in parental termination cases. 

 To illustrate, if a parent 
produced evidence that made it equally as likely that the affidavit was 
involuntary as it was that the affidavit was voluntary, the parent would not 
have carried the preponderance burden of proof that some courts of appeals have 
imposed. But, a court could not sustain termination on such a record because “a 
reasonable trier of fact could [not] have formed a firm belief or conviction 
that its finding was true.” 

 
            Some 
courts of appeals have held that the logical progression of placing the burden 
of proof on a parent in challenging an affidavit is that on appeal, not only 
does a parent have to show that there was no evidence to support the trial 
court’s finding that the affidavit was signed knowingly and voluntarily, the 
parent must also establish as a matter of law that the affidavit was not 
knowingly or voluntarily executed. 

 This is clearly at odds 
with the constitutional and, in Texas, statutory requirement that a trial court 
cannot terminate a parent’s rights unless it finds grounds to do so from clear 
and convincing evidence.
            The 
confusion that some courts of appeals have had regarding a parent’s burden is 
shared by Duenas and Inocencio. In their briefing in this Court, they quote from 
In re Bruno, 

 saying that an “‘affidavit 
may be set aside only upon proof, by a preponderance of the evidence, that the 
affidavit was executed as a result of coercion . . . .’” 

 However, neither the trial 
court nor this Court has been led into error by these statements. The transcript 
of the termination hearing reflects that the trial court was unpersuaded that 
the parents bore the burden of proving by a preponderance of the evidence that 
they had not voluntarily signed the affidavits. More importantly, the trial 
court’s order terminating Duenas’s and Inocencio’s parental rights affirmatively 
found based on clear and convincing evidence that each parent had executed an 
affidavit voluntarily. The trial court did not fail to find that Duenas’s 
or Inocencio’s affidavit was knowing or voluntary, which would have been 
appropriate if the trial court thought the parents had the burden of proof 
regarding their affidavits. Nor does the trial court’s order or any of its 
findings mention preponderance of the evidence or otherwise indicate that it 
placed the burden of proof on Duenas and Inocencio. The trial court correctly 
concluded that it could not terminate the parents’ respective rights unless it 
found by clear and convincing evidence that they had voluntarily executed an 
affidavit of relinquishment. This Court should not mislead the bench and bar by 
applying a different, incorrect burden of proof and consequently an incorrect 
standard of review on appeal simply because a party’s briefing incorrectly 
states the burden of proof. Nor should we ignore controlling United States 
Supreme Court precedent. In Santosky v. Kramer, the Supreme Court 
squarely held that in parental termination proceedings, due process requires 
that the burden of proof be at least clear and convincing evidence because the 
risk of error from using a preponderance standard is too great:
Today we hold that the Due Process 
Clause of the Fourteenth Amendment demands more than this. Before a State may 
sever completely and irrevocably the rights of parents in their natural child, 
due process requires that the State support its allegations by at least clear 
and convincing evidence.

* * *
 
In parental rights termination 
proceedings, the private interest affected is commanding; the risk of error from 
using a preponderance standard is substantial; and the countervailing 
governmental interest favoring that standard is comparatively slight. Evaluation 
of the three Eldridge factors compels the conclusion that use of a 
“fair preponderance 
of the evidence” 
standard in such proceedings is inconsistent with due process. 

 

            The 
statute under review in Santosky permitted a state to terminate a 
parent’s rights upon a finding by a preponderance of the evidence “that the 
child is ‘permanently neglected.’” 

 The Supreme Court did not 
specifically address termination based on an affidavit of relinquishment. But 
the Supreme Court’s reasoning and holdings were broad, and this Court must 
follow Supreme Court precedent unless and until the Supreme Court narrows or 
changes its reasoning and holdings. 

 
            To 
say that a biological parent must prove by a preponderance of the evidence that 
an affidavit of relinquishment was involuntary not only shifts the burden of 
proof to the biological parent, it would lead to the incongruous 
result that a preponderance standard is constitutionally infirm for resolving 
some factual disputes over whether grounds exist for termination of parental 
rights, but would be acceptable in determining if other grounds – such as an 
affidavit signed by a parent – exist. The Supreme Court seems to have foreclosed 
parsing of this kind when it said in Santosky, “this Court never has 
approved case-by-case determination of the proper standard of proof for a 
given proceeding. Standards of proof, like other ‘procedural due process 
rules[,] are shaped by the risk of error inherent in the truth-finding process 
as applied to the generality of cases, not the rare exceptions.’” 


 The Supreme Court 
elaborated, explaining that the value society places on the individual liberty 
at issue dictates the degree of confidence in the correctness of factual 
conclusions:
“[T]he standard of proof is a 
crucial component of legal process, the primary function of which is 
‘to minimize the risk 
of erroneous decisions.’” Notice, summons, right to 
counsel, rules of evidence, and evidentiary hearings are all procedures to place 
information before the factfinder. But only the standard of proof 
“instruct[s] the 
factfinder concerning the degree of confidence our society thinks he should have 
in the correctness of factual conclusions” he draws from that information. 
The statutory provision of right to counsel and multiple hearings before 
termination cannot suffice to protect a natural parent’s fundamental liberty interests if 
the State is willing to tolerate undue uncertainty in the determination of the 
dispositive facts. 

 

            The 
Supreme Court concluded: “Thus, at a parental rights termination proceeding, a 
near-equal allocation of risk between the parents and the State is 
constitutionally intolerable.” 

 Any parens patriae 
interest a state may have in terminating a biological parent’s rights arises 
only after grounds for terminating that parent’s rights have been found in a 
court of law to exist. 

 Accordingly, the Supreme 
Court explained, the “State’s interest in finding the child an alternative 
permanent home arises only ‘when it is clear that the natural parent 
cannot or will not provide a normal family home for the child.’” 

 The Supreme Court 
continued: “At the factfinding, that goal is served by procedures that promote 
an accurate determination of whether the natural parents can and will provide a 
normal home.” 

 This reasoning applies with 
equal force when an affidavit of relinquishment is the evidentiary basis for 
finding that the parent will not provide a home for the child. There must be 
clear evidence that the affidavit was a knowing and voluntary statement 
that the parent has chosen to relinquish all responsibility and rights regarding 
the child.
            The 
Supreme Court also expressly rejected the idea that a child’s interest in 
stability might outweigh the interests of a biological parent. The 
Santosky decision held that a state court’s suggestion “that a 
preponderance standard properly allocate[d] the risk of error between the 
parents and the child . . . is fundamentally mistaken.” 

 The Court reiterated in 
that decision, “we 
cannot agree . . . that a preponderance standard fairly 
distributes the risk of error between parent and child.” 

 The Court said, “the 
parents and the child share an interest in avoiding erroneous 
termination.” 

 The state 
court’s rationale for 
using a preponderance of the evidence standard “reflect[ed] the judgment that 
society is nearly neutral between erroneous termination of parental rights and 
erroneous failure to terminate those rights.” 

 The Supreme Court soundly 
rejected this assessment of a parent’s and child’s respective interests. 

 
            The 
Supreme Court reasoned that the consequences for an erroneous termination are 
more severe for a parent than a child:
For the child, the likely 
consequence of an erroneous failure to terminate is preservation of an uneasy 
status quo. For the natural parents, however, the consequence of an erroneous 
termination is the unnecessary destruction of their natural family. A standard 
that allocates the risk of error nearly equally between those two outcomes does 
not reflect properly their relative severity. 

 
            The 
Supreme Court has also clearly indicated that any interest of prospective 
adoptive parents does not change this analysis. 

 Accordingly, in determining 
whether grounds for termination exist, to which the Supreme Court referred as 
the “factfinding” stage, 

 the vital interest in 
preventing erroneous termination requires a clear and convincing standard: “But 
until the State proves parental unfitness, the child and his parents share a 
vital interest in preventing erroneous termination of their natural 
relationship. Thus, at the factfinding, the interests of the child and his 
natural parents coincide to favor use of error-reducing procedures.” 

 
            In 
the case before us today, the children and their parents likewise share a vital 
interest in preventing erroneous termination. The error-reducing procedure 
required by the United States Supreme Court in Santosky and by the Texas 
Legislature in Family Code section 161.001(1)(K) is that a court may not 
terminate a parent’s 
rights unless it finds grounds for termination by clear and convincing evidence. 
The sole ground for termination in this case is the execution of affidavits of 
relinquishment. Unless and until there is clear and convincing evidence that an 
affidavit was indeed knowing and voluntary, termination cannot lawfully 
occur.
            Once 
again, I do not suggest that an affidavit that appears on its face to have been 
properly executed cannot constitute clear and convincing evidence when there is 
no challenge to the affidavit. But when there is evidence that the affidavit was 
not voluntary, all the evidence must be considered to determine whether there is 
clear and convincing evidence that it was voluntary.
IV
            In 
this case, Duenas presented evidence that he could not read the affidavit, that 
his command of the English language was very minimal, and that critical 
provisions were not translated for him into Spanish. In the face of this 
evidence, what clear and convincing evidence was there from which the trial 
court could have found that Duenas knowingly and intelligently surrendered his 
parental rights with sufficient awareness of the relevant circumstances and the 
likely consequences? 

 Section 161.103 of the 
Texas Family Code requires that an affidavit of relinquishment state that the 
parent has been informed of parental rights and duties and whether the affidavit 
is revocable, irrevocable, or irrevocable for a stated period of time. 

 What clear and convincing 
evidence is there that Duenas was apprised of these matters and then voluntarily 
relinquished all parental rights?
            The 
decision in Queen v. Goeddertz, 

 cited by Duenas in his 
briefing in this Court, is instructive. In that case, a father executed an 
affidavit relinquishing his parental rights so that his wife’s new husband could 
adopt the child. In two places on the affidavit, handwritten additions had been 
inserted that said the relinquishment was subject to the biological father’s 
understanding that he would have the right to visit the child each month. 


 The court of appeals held 
that this provision was unenforceable and that the voluntariness of the 
affidavit was thereby negated. 

 
            In 
this case, as can be seen from the evidence, Duenas understood that “he wasn’t 
going to be the father anymore.” But that is not the same as an understanding 
that he would no longer be able to visit or telephone his children, or take them 
to a ball game, or attend school functions, or indeed, see them again. 
Furthermore, it is undisputed that Duenas was never told that the affidavit was 
irrevocable for sixty days and that during that time, his children could be 
adopted by people he did not know and that all ties he had with the children 
would be severed.
            Because 
the Court characterizes the evidence surrounding Duenas’s execution of his 
affidavit, I think it is helpful to look at the evidence itself, as Justice Hecht’s dissent has done. The 
Court says that the trial court could have made its own determination about the 
extent to which Duenas understood English in spite of the undisputed 
testimony that Duenas’s command of the English language was extremely limited. 
The Court’s reasoning is directly contrary to our precedent. At most, the trial 
court could have had a suspicion about the extent of Duenas’s proficiency in the 
English language. But that is not legally sufficient evidence, particularly when 
the burden of proof is clear and convincing evidence. 

 Esther Gonzalez, who is 
Inocencio’s sister and who was largely responsible for arranging the adoptions, 
said unequivocally and without contradiction, “I am not fluent in Spanish, so I 
cannot communicate with him [Duenas] . . . . So, if anything, it 
would have to be told to him. My mother and my sister would have to be the 
ones.” Gonzalez also stated, “I have not had any communication with Ricardo 
[Duenas] one on one because I cannot converse fluently in 
Spanish.”
            A 
paralegal for the Monteguts’ attorney understood some Spanish, and she witnessed 
all the events when the affidavits were signed. She testified that throughout 
the process, Duenas: “Never said a word.” With regard to what was actually 
translated for Duenas, the paralegal testified that Inocencio’s mother only told 
Duenas:
∙“That he was giving up his rights 
of the children, and that he will no longer be responsible for them. And that 
once this is all through, that’s it, you know.”
 
∙“She’s just saying that his 
father – he wasn’t going to be the father anymore, that he’s giving up his 
rights. That’s what she was telling him.”
 
∙Q. “So did she tell him whether 
or not he would have an opportunity to change his mind later?”
A. “No, she 
didn’t.”

            As 
Justice Hecht’s dissent points 
out, 

 when various witnesses say 
that Duenas “understood,” they could not have meant that Duenas understood all 
of what was contained in the seven-page, single-spaced document that no one 
translated for him. The extensive contents of the affidavit are set forth 
verbatim in Justice Hecht’s 
dissent.
            The 
Court notes that Duenas submitted a Statement of Paternity to the trial court in 
which the verification said that Duenas had “read the Statement of 
Paternity.” 

 But there is no contention 
by any of the parties, much less evidence, that this Statement was not 
translated into Spanish for Duenas.
            The 
record contains no clear and convincing evidence that Duenas understood that by 
signing the Affidavit of Relinquishment put before him, his children could be 
adopted by strangers and he could never again have any contact with them. To the 
contrary, the evidence is overwhelming that Duenas was never told in Spanish, 
the only language he could speak or read, about material aspects of the 
affidavit he was signing. 
V
            A 
word in response to the suggestion in Justice O’Neill’s concurring opinion 
that Duenas waived his constitutional rights as a parent by failing to maintain 
a closer relationship with the twins is in order. The trial court found that 
“[t]he legal parent-child relationship between [Duenas] and the children did not 
exist at the time of the signing of the Father’s Affidavit of Relinquishment of 
Parental Rights.” That is not a finding that a legal parent-child relationship 
did not exist thereafter. The trial court’s same findings reflect that Duenas 
filed a Statement of Paternity, which was executed after he signed the 
relinquishment affidavit. The record is also clear that Duenas was attempting to 
set aside the relinquishment affidavit. The trial court further found that by 
the time of trial, Duenas and Inocencio had married one another. There is also 
evidence that Duenas had some relationship with his children. He took them to 
receive medical care and provided some monetary support, although there is 
conflicting evidence as to the amount and extent of that support. But no one has 
ever suggested, and there is no basis for suggesting, that Duenas is not the 
father of the children or that he waived his parental rights by failing to 
establish a closer relationship with his children.
VI
            As 
additional grounds for terminating Duenas’s parental rights, the Monteguts 
alleged in their petition in the trial court that Duenas had actually or 
constructively abandoned the children. The Monteguts did not request the trial 
court to make any findings of fact or conclusions of law regarding these claims, 
and the trial court made none. The trial court’s judgment as to Duenas was based 
only on his affidavit of relinquishment. The Monteguts have not argued in the 
trial court, the court of appeals, or this Court that the trial court should 
have based its judgment on additional or alternative grounds. Accordingly, there 
are no further issues to be resolved by the trial court in the current suit to 
terminate Duenas’s parental rights.
VII
            I 
agree that the order terminating Inocencio’s parental rights should be upheld, 
but I disagree with Justice 
O’Neill’s concurring opinion that none of Inocencio’s arguments were preserved for 
appeal. Inocencio framed the issue in this Court challenging the voluntariness 
of her affidavit as follows: “Should the order terminating MARIA’s [Inocencio’s] 
parental rights be set aside since MARIA’s signature on the affidavit of 
relinquishment of her parental rights was procured in exchange for ‘small 
kindnesses’ and unenforceable promises which constitute undue influence or 
overreaching as a matter of law?” She argues in her brief that Detective 
Goetschius, a policeman who was also the Monteguts’ brother-in-law, first came 
into contact with her when she had “been in trouble with the law for dancing at 
a strip club while underage.” She states that she met Detective Goetschius when 
he was “taking her statement as part of his official investigation of her 
alleged illegal activity.” She further asserts in her brief: “His interest in 
MARIA peaked when he found out that she was pregnant and thereafter he began 
giving her advice, taking her to doctor’s appointments and contacting her 
mother.” She asserts: “No line was ever drawn to distinguish as to when he was 
acting in his capacity as a police professional . . . and when he was 
acting on behalf of his brother-in-law, [Mr. Montegut].”
            Inocencio 
argues that, as a matter of law, Detective Goetschius’s conduct amounted to 
undue influence or overreaching. It is clear from Inocencio’s briefing that she 
is challenging the legal sufficiency of the evidence that supports the trial 
court’s finding that she voluntarily executed an affidavit of relinquishment and 
the finding that the affidavit was not procured by fraud, duress, or coercion. 
For the reasons discussed above in Part III, Inocencio does not have to 
establish, as a matter of law, that she did not voluntarily sign her affidavit 
of relinquishment. 

 She must only establish 
that there was legally insufficient clear and convincing evidence to support the 
trial court’s termination of her parental rights based on the affidavit. Nor did 
her error of law regarding her burden lead the trial court or this Court into 
error, as also discussed above in Part III.
            Inocencio 
has not waived or failed to preserve her legal sufficiency challenge. Justice O’Neill’s concurring opinion is 
mistaken in contending otherwise. A majority of this Court correctly concludes 
that Inocencio’s legal sufficiency challenge should be reviewed on its merits 
and should not be summarily dismissed. This same majority disagrees over whether 
her arguments carry the day when they are analyzed on their merits. However, a 
different majority of the Court affirms the court of appeals’ judgment with regard to 
Inocencio, albeit for differing reasons.
            I 
conclude that Inocencio’s legal sufficiency challenge should not be sustained. 
The evidence regarding Detective Goetschius’s “small kindnesses” toward 
Inocencio and his influence on her is disputed, but a reasonable trier of fact 
could have formed a firm belief that they did not induce or unduly influence 
Inocencio to sign her affidavit. There was testimony that after Detective 
Goetschius discovered Inocencio was pregnant, he took her to doctors’ 
appointments and asked how her pregnancy was going. Inocencio’s mother said that 
when Goetschius first learned Inocencio was pregnant, he asked both of them 
whether they had thought of adoption and said he knew people with money who 
would want the baby. Both Inocencio and Goetschius, however, testified that they 
once spoke generally about adoption and that Goetschius told her he had adopted 
one of his children and it had been a good experience, but that he never 
counseled her to give her baby up for adoption. Goetschius was not present when 
the affidavit was executed. In reviewing this evidence, the trial court could 
reasonably have formed the firm belief that Goetschius’s contact with Inocencio 
during her pregnancy and their single general discussion of adoption did not 
influence Inocencio to sign the affidavit.
            Inocencio 
also argues in this Court that Detective Goetschius and Mark Ciavaglia, the 
Monteguts’ attorney for the adoption proceedings, violated section 162.025 of 
the Texas Family Code 

 by acting as intermediaries 
in a private adoption without being licensed in accordance with Chapter 42 of 
the Texas Human Resources Code. 

 There was testimony at the 
trial that neither Children’s Protective Services nor a private adoption agency 
was involved in any way in the Monteguts’ attempted adoption of the twins. But 
there is no evidence that the absence of a licensed adoption agency influenced 
Inocencio’s decision to sign her affidavit of relinquishment.
            More 
troubling is Inocencio’s argument that she only agreed to sign her affidavit 
after the Monteguts made promises in writing to send her updates and photographs 
of the children periodically and to allow her to give gifts to the children 
through Ciavaglia. Inocencio now contends that those promises are unenforceable, 
and that because she conditioned her execution of the affidavit on those 
promises, she was fraudulently induced to sign the affidavit. However, Inocencio 
never argued in the trial court that the agreement was unenforceable. Further, 
the Monteguts have never taken the position that the agreement is unenforceable 
or that they do not intend to honor it. Inocencio never asked the trial court to 
include any sort of finding about the enforceability of the agreement in the 
termination order. Nor did she request the trial court to include in the order a 
directive that the Monteguts were to provide her periodically with pictures and 
an update. In fact, when the Monteguts’ attorney first questioned Inocencio 
about the agreement to send pictures and updates, her own attorney objected to 
the subject, stating, “I don’t really see that it’s relevant to the issue of 
fraud and duress.” The trial court was never asked to rule on whether the 
Monteguts’ promises were enforceable or whether, if unenforceable, Inocencio’s 
affidavit was procured by fraud, duress or coercion. Inocencio cannot now ask 
this Court to resolve that issue.
            The 
trial court could reasonably have formed a firm belief or conviction that 
Inocencio voluntarily executed the affidavit of relinquishment. 

 Inocencio clearly 
understood what she was signing and was aware of the likely consequences of 
executing the affidavit. Viewing the evidence in the light most favorable to the 
trial court’s findings, I would hold that there is legally sufficient, clear and 
convincing evidence to support the trial court’s finding that Inocencio’s 
execution of her affidavit of relinquishment was voluntary and not the result of 
fraud, duress, or coercion. Accordingly, I concur in the judgment with regard to 
Inocencio. 
* * * * *
            For 
the foregoing reasons, I concur that the court of appeals’ judgment should be 
affirmed as to Inocencio. But I dissent from the judgment that terminates 
Duenas’s parental rights.
___________________________
Priscilla R. Owen
Justice 
OPINION DELIVERED: September 18, 
2003